## 15263

CLAFFY *ET AL.* v. MECHANICS BUILDING & LOAN ASSOCIATION *ET AL.*

*EX PARTE* CALHOUN *ET AL.*

(15 S. E. (2d), 142)

*Messrs. DePass & DePass,* of Spartanburg, for Bertha R. Claffy *et al.,* plaintiff-appellants,

*Messrs. Perrin & Tinsley,* and *Mr. Horace L. Bomar,* all of Spartanburg, for respondents,

*Messrs. Carlisle, Brown & Carlisle,* and *Messrs. Evans, Galbraith & Holcombe,* all of Spartanburg, for Julian Calhoun *et al.,* petitioners-appellants,

*Messrs. DePass & DePass,* of Spartanburg, for Bertha R. Claffy and others, plaintiffs-respondents,

*Messrs. Carlisle, Brown & Carlisle* and *Messrs. Evans, Galbraith & Holcombe,* all of Spartanburg, for Julian Calhoun and others, petitioners-respondents,

*Messrs. DePass & DePass,* of Spartanburg, in reply for Bertha R. Claffy and others, plaintiff-appellants,

May 16, 1941.

The opinion of the Court was delivered by MR. ASSOCIATE JUSTICE BAKER.

There is but one Circuit Court order deciding the issues arising out of the litigation in the two above-stated cases. Hence, one opinion.

On June 4, 1938, Receivers were appointed for Mechanics Building & Loan Association of Spartanburg, S. C., by an order of Honorable T. S. Sease, Circuit Judge, not for the reason that said building and loan association was insolvent but for the purpose of liquidation and conservation of its assets. In the order of Judge Sease appointing Receivers it was stated that Mechanics Building & Loan Association was solvent; and in a jurisdictional dispute between the State Board of Bank Control on the one side and Mrs. Bertha R. ·Claffy *et al.*, in their own right, etc., and Mechanics Building & Loan Association and the Receivers appointed by Judge Sease on the other side, this Court stated: "Indeed it has been juridicially determined that Mechanics Building & Loan Association is solvent (order of Judge Sease of June 4, 1938). There are no depositors or creditors in the sense that the words 'depositors and creditors' are used in the 'State Board of Bank Control Act [Act May 9, 1936, 39 St. at Large, p. 1484].'"

See *ex parte Miller et al.* (*Claffy et al. v. Mechanics Building & Loan Association*), 191 S. C., 260, 1 S. E. (2d), 512, 515, decided March 3, 1939, for a history of this litigation to that date.

The order appointing Receivers directed the Master to take testimony "upon all issues arising upon any question made as to claims filed or the rights and priorities of any stockholders or class of stockholders." Thereafter, the Master in equity for Spartanburg County advertised for claims in accordance with an order of Judge Sease dated March 31, 1939.

On June 6, 1939, Julian Calhoun and others, in behalf of themselves and others of a class, filed their verified petition alleging that stock Series 36 duly matured and that holders of stock in said series should be accorded priority in

payment of the balance due on principal together with interest at 5% on the unpaid portion. Such claim on the part of the stockholders of Series 36 arose by reason of the fact that in August, 1932, the directors of the Association had declared Series 36 matured by the 80th payment, that is, worth $100.00 per share. The association was not able to pay in cash the holders of certificates in Series 36, but out of the proceeds of a loan from the Reconstruction Finance Corporation, a dividend of 67% was paid in November, 1932. In January, 1933, the directors of the Association voted to allow "5% interest on deferred payments due the stockholders of this Series." Thereafter, other installments on principal were paid between December 16, 1935, and October, 1937, sufficient to make a total of 92.87%, but nothing was ever paid on interest.

On February 5, 1935, a liquidating committee for the association was appointed, and it was this committee that paid the last-mentioned additional dividends to stockholders in Series 36.

On August 8, 1932, the directors of the association met and the minutes show that the officers of the association were authorized to "wind up" Series 36. On October 24, 1932, the directors again met and the minutes show that the president, treasurer, and attorney for the association were instructed to go to Charleston and make arrangements for a $150,000-.00 loan, "and upon their return to call another meeting of the board of directors for final action as to settlement with maturing stockholders in Series 36." On November 15, 1932, the directors met and according to the minutes, the treasurer of the association was instructed to endorse the certificates of stock in Series 36, "which has now matured, with a payment of 67% upon payment of same to the stockholders, and the certificate to be returned to the stockholders, and the association to give no other evidence of indebtedness, and the balance to be paid on order of the board of directors without interest." On January 17, 1933, the stockholders

held their annual meeting and according to the minutes the stockholders recommended to the board of directors that "the shareholders in Series 36, which has matured, and on which a payment of 67% has already been made, be allowed 5% interest on deferred payments due the stockholders of this Series." Following this recommendation, the board of directors voted this interest from November 16, 1932, until the full amount on this stock was paid.

On February 5, 1935, a stockholders' meeting was held and by resolution the affairs of the association were placed in the hands of an executive committee for the purpose of making as equitable a distribution of its assets as it is possible for them to do. While it is true that members of Series 36 participated in this meeting, they were not asked to relinquish any right to priority of payment and there is no such implication. As stated by the Master in equity in his report "the vote of Series 36 was necessary on a decision to liquidate and thereby discontinue further installment payments by holders of unmatured stock." Continuing, the Master says: "Their vote was also necessary on the decision to liquidate by an executive committee out of Court, rather than by directors under the statute law or by Receivers under Court supervision. The giving of assent in those particulars could not imply assent to surrender other substantial rights, and the further record fails to show that it was so understood by any interested party. The records show affirmatively that it was not so understood."

Again quoting from the Master's report:

"On February 11, 1935, the executive committee met and according to their minutes 'the secretary and treasurer was also instructed to consolidate all series and employ Mr. A. L. Broadwater to set up a new system of books, doing away with individual series except Series No. 36:'

"On April 15, 1935, the executive committee sent out a circular to all stockholders enclosing a list of properties to

be offered for sale on May 1, following. The following excerpts are taken from the circular:

" 'All fully paid-up shareholders in Series No. 36 will be credited with $100.00 per share, less the 67% already paid on same, plus interest on the balance, as agreed, at 5% until paid. Fully paid-up shares in Series No. 36 have the advantage of getting credit for one hundred cents on the dollar for what they have paid in, plus $20.00 per share, plus interest, as agreed, on the deferred balance at the rate of 5%.

" 'No cash dividends will be paid to investing shareholders in subsequent series until investing shareholders in Series No. 36 have been settled with in full. All shareholders in series subsequent to Series No. 36 will be credited with the full amount paid into the association.

" 'If, and when, sufficient assets of the association have been converted into cash to reimburse the remaining shareholders, the association will then reimburse such shareholders the actual amount paid into the association.

" 'If any assets remain after all investing shareholders have received the full amount paid into the association, these profits shall be divided among all the investing shareholders (except shareholders in Series No. 36, who will already have been settled with in full), based on the amount paid into the association by all investing shareholders who have turned in their stock to the association during the liquidation, beginning February 5th, 1935,   *    *    *

" ' "The recent audit of our association by the State Bank Examiners, who are now examining all the building and·loan associations of the state as well as all state banks, is very gratifying. Their audit reveals the fact that our association is in a solvent condition, with no obligations other than to our stockholders. The examiners spent more than two weeks going into minutest details in order to get· for us the true condition of the association.

" ' "Every piece of real estate owned by the association and all properties covered by mortgages held by the associ-

ation have been appraised to ascertain whether we have any loss in them or not. As a result of these appraisals, our auditor has set aside as a reserve for losses on our own real estate and on the mortgages we own, a total of approximately $110,000.00, and after setting aside this amount for losses, the audit shows that we have a surplus left of $153,710.33. Our auditor's statement shows the amount due the investing shareholders to be $565,145.05, and the $153,710.33 surplus gives us a margin in excess of 26% over and above the amount paid in by the investing shareholders." '

"On June 17, 1935, the executive committee circularized 'the investing shareholders in Series .No. 36,' informing them:

" 'On Monday, July 1st, 1935, the Mechanics Building and Loan Association will offer for sale to the shareholders of the association in Series No. 36, for stock in that Series, $25,000.00 worth of 2¾% Home Owners' Loan Corporation bonds that are guaranteed as to principal and interest by the United States Government, and also $3,000.00 of the Town of Chesnee 5½% tax free bonds due July 1st, 1948. Home Owners' Loan Corporation bond denominations as low as $25.00 will be offered, but the Chesnee bonds are only in $1,000.00 denominations. These bonds will be offered to the highest bidder, but in no event will bids for less than par and accrued interest be considered. Home Owners' Loan Corporation 2¾% bonds are quoted on today's market at $100.59.

" 'Shareholders in Series No. 36 can bid the amount due them by the association, plus 5% interest on this balance from November 16th, 1932, to date. These bonds are being offered exclusively to the shareholders in Series No. 36, due to the fact that the Board of Bank Control has declared that the shareholders in Series No. 36 have a prior claim over the shareholders in any other series in this association.

"On July 1, 1935, the executive committee again met and the following appears from the minutes:

" 'On motion of Mr. C. B. Fretwell the committee voted to sell $30,000.00 of Home Owners' Loan bonds and pay a 40% dividend on the principal balance due shareholders in Series No. 36 as of July 16th, 1935.'

"On September 30, 1935, at a meeting of the executive committee it was 'decided to accept the balance due shareholders in Series No. 36 on the purchase price of mortgages to be sold at face value.'

"On November 30, 1935, the executive committee, according to the minutes, 'voted to pay a 20% cash dividend on the balance due the shareholders in Series No. 36, the payment of this dividend to be made on December 16th, 1935.'

"On December 7, 1935, the executive committee again circularized 'the investing shareholders in Series No. 36' informing them 'that on December 16, 1935, we will pay a 20% dividend on the principal balance due you on your shares in our Series No. 36. This dividend is payable only to the shareholders in Series No. 36, because the Board of Bank Control has declared that the shareholders in Series No. 36 have a prior claim over the shareholders in any other series of this association. Please present your certificate in Series No. 36 at this office on or after December 16th and receive your check.'

"On January 31, 1936, the minutes of the executive committee show the following:

" " 'The committee voted to submit a list of certain delinquent mortgages to the shareholders in Series No. 36, offering them to the highest bidder in that series, the balance due on each mortgage plus interest to date of sale being the minimum for which any mortgage will be sold, but every mortgage on which the minimum or a better amount is offered will be sold. The shareholders in Series No. 36 are to be given ten days within which to make their bids and after that date the list of mortgages, after deducting therefrom any mortgages that may be sold or for which arrangements have been made for paying them off, will be mailed to the

remaining shareholders, open bids to be accepted for same, the executive committee reserving the right to reject any and all bids.'

"On March 7, 1936, the executive committee circularized all of the stockholders, and the following are excerpts from the circular:

" 'Since May 1st, 1935, we have reduced the amount of paid-in capital stock held by the investing shareholders from $563,323.05 to $341,987.01, a total reduction of $221,336-.04 as per our auditor's statement of December 31st, 1935. This means that from May 1st, 1935, to December 31st, 1935, a period of only eight months, our outstanding investment stock has been reduced more than 39%. This has been accomplished by the payment of $38,509.34 in cash to the stockholders of Series No. 36, which was declared to be a preferred series by the State Board of Bank Control, and by retiring $182,826.70 of paid-in stock of other series by disposing of certain real estate and mortgages, owned by the association, in exchange for stock in the other series. Many of these trades have been made on a basis that was extremely advantageous to the Association.   *   *   *

" 'After setting aside $10,871.93 to take care of interest due on deferred payments to stockholders in Series No. 36, and after paying out $11,488.16 for improvements and repairs to our real estate, our net shrinkage for the period amounted to only $8,427.14, and after deducting this amount from our $153,541.07 surplus, it leaves a remaining surplus of $145,113.93, and we are still carrying the same $124,655-.00 that was set up at the beginning of the period as a reserve for losses.

" 'The amount of remaining paid-in capital due the investing shareholders amounts to $341,987.01, plus $10,871-.93 interest due shareholders in Series No. 36, making a total of $352,858.91 due all investing shareholders, and the above mentioned surplus of $145,113.93 leaves a margin in

excess of 41% over and above the amount due all investing shareholders.

" 'The principal balance due shareholders in Series No. 36, which is preferred, now amounts to $35,534.91, plus $10,871.93 accrued interest on the deferred payments, makes a total of $46,406.84 due this series as of December 31, 1935.'

"On September 29, 1937, the minutes of the executive committee showed the following:

" 'The committee voted a 40% dividend on the principal balance due shareholders in Series No. 36 as of October 16, 1937, after which the meeting adjourned.'

'It is clear from the foregoing that the priority rights of Series No. 36 to the balance of principal and 5% interest, recognized before the liquidation by stockholders, directors and officers, were thereafter recognized by the executive committee and the State Board of Bank Control and impliedly by stockholders who with access to the minutes of the executive committee and the records of the association and with the information given in the general circulars of April 15, 1935, and March 7, 1936, nevertheless raised no protesting voice. There is no proof of protest by any one until the answer of Bertha Claffy and others was filed on July —, 1939, almost seven years after the declared maturity of Series No. 36 and more than four years after the liquidating resolution and its published interpretation by the executive committee in the general circular of April 15, 1935, as quoted above i. e., that 'fully paid-up shares in Series No. 36 have the advantage of getting credit for one hundred cents on the dollar for what they have paid in, plus $20.00 per share, plus interest, as agreed, on the deferred balance at the rate of 5%, and would not participate in any of the profits which the surplus of $153,710.33 and the reserve of $110,000.00 rendered probable".

Bertha R. Claffy et al., in their own right and in behalf of a class (owners of stock Series 37), plaintiffs-appellants,

entered a general denial as to the claim of stockholders in Series 36. They further alleged that if it should be adjudged that Series 36 matured, then it should also be held that Series 37 matured.

Further quoting with approval from the report of the Master:

"The claim of Series No. 37 to priority seems to be on a different basis of fact from Series No. 36.

"It is alleged in answers of Claffy *et al.*, and in the 'claim' filed by No. 37 that 'stock in Series 36 was set up on the books of the association as an indebtedness of the association at par   *   *   *   whereas Series 37 was set up at the amount paid in.' It is alleged that 'Series 37 matured in the same manner and to the same extent as Series 36.' The prayer to the claim is 'that if it should be adjudged that Series 36 matured that it also be adjudged that Series 37 matured,' etc.

"I hold that Series No. 37 stands in different plight from Series No. 36. It appears by the minutes of January 6, 1934, that the directors then authorized the officers 'to close Series No. 37 with the January payment 1934, this being the eighty-fifth payment due this series.' That the word 'close' merely meant no further payments were to be required is shown from the fact that there was no declaration that the stock was worth par, nor that it had 'matured.' It was not treated as matured, and at a later date all who had paid the eighty-five installments received a refund of $5.00 per share, which explains the allegation in Paragraph 7 of the counterclaim of plaintiffs that 'the stockholders in Series 37 paid in the same amount as the stockholders in Series 36, namely eighty payments' instead of the 85 payments referred to in the minutes above. At no time during the almost six years after the series was 'closed' does the record show that it was ever regarded or treated as having matured by reaching par."

A petition was also filed by Ella Wall, the holder of five shares of stock in Series 42, which in substance presented opposition to the allowance of the claims filed by Series 36 and Series 37 on the same grounds as presented in plaintiff's answer above.

The Receivers filed an answer to the petitions filed setting forth certain records of the association but denying generally the claim of any stockholders to priority of payment.

The stockholders of Series 37 excepted to the report of the Master upon fifty-three grounds. The representatives of Series 36 filed one exception thereto, assigning error in not allowing interest up to date of payment of claims.

The Honorable G. Duncan. Bellinger, Circuit Judge, before whom exceptions to the Master's report were argued, and from whose order the appeal comes to this Court, succinctly sets forth the holdings of the Master to be:

"(1) That Series 36 had been properly matured, and has been recognized as having matured since November 15, 1932, and stockholders in other series are now estopped to deny that said stock was properly matured.

"(2) That the shareholders in Series 36 must be accorded priority in the distribution of the assets of the association.

"(3) That Series No. 37 is not entitled to be recognized as having been matured, or entitled to any preference in the distribution of the assets of the association."

Judge Bellinger summarized the issues raised by the exceptions to the Master's report as follows:

"(1) Is Series 36 entitled to be recognized as a matured series?

"(2) If so, are the stockholders in Series 36 entitled to any preferential treatment in the distribution of the assets of the association, or should they, as matured stockholders, be treated as having merely an unpreferred claim of $100.00 per share?

"(3) Is Series 37 to be regarded by the receivers as a matured series?

"(4) If so, are the stockholders of Series 37 entitled to any priority over other stockholders in the distribution of the assets of the association?

"(5) Should interest be paid to any group of stockholders?"

The holding of Judge Bellinger according to his own summarization, was:

1. That Series 36 is to be treated as a matured series and in the distribution of the assets of the association, the present owners of stock in said series are entitled to a claim of $100.00 per share, less the dividends already paid thereon, with interest on the deferred balance at 5% per annum.

2. That Series 37 is not to be recognized as a matured series but stockholders in Series 37 have an unpreferred claim for $80.00 per share, which is the paid-in value of stock in that series.

3. That no preference is to be accorded the stockholders in Series 36 in paying them the deferred balance due on their stock, or the interest thereon. Shareholders in subsequent series are entitled to receive 92.87% of the paid-in value of their stock before any further payments are made to shareholders in Series 36. After shareholders in series other than 36 have received 92-87% of the paid-in value of their stock, the remaining assets are to be distributed to stockholders in all series on a pro-rata basis, interest being computed on the deferred balance due Series 36 to the date of the receivership order as a part of what remains to be paid to the shareholders in Series 36.

Bertha R. Claffy *et al.,* representing Series 37, state the "Questions Involved" to be:

"1. Should Series 36 be treated as duly matured?

"2. Is it now too late to contest maturity of Series 36?

"3. Should Series 37 be treated as duly matured?

"4. Should interest be paid to stockholders in Series 36?"

The Receivers of the Association (defendants-respondents) have filed a brief in which they state the "Questions

Involved" with but slight variation, but we here set them out.

"(1) Is Series 36 to be recognized as a matured series?

"(2) If so, are stockholders in Series 36 entitled to a preference in the distribution of the assets of the association?

"(3) Should interest be paid on the deferred balance due stockholders in Series 36 if that series is treated as having matured?

"(4) Is Series 37 to be treated as a matured series, or given any preference in the distribution of the assets of the association?"

Julian Calhoun *et al.*, representing Series 36, practically adopt the "Questions Involved" as hereinbefore stated.

The Master found as a fact that Series 36 duly matured. The trial Judge did not directly find that this series (36) matured, but he held that in view of the action of the stockholders and officers of the corporation, it is now too late for stockholders in any subsequent series to take the position that Series 36 is not entitled to be recognized as a matured series; and that "any exceptions to that portion of the Master's report which holds that Series 36 is to be recognized as a matured series are hereby overruled." So that, in effect, we have a holding by the Master, concurred in by the Circuit Judge, that Series 36 is matured.

In *Hannon v. Mechanics B. & L. Association*, 177 S. C., 153, 180 S. E., 873, 877, 100 A. L. R., 928, it is stated: " * * * We think the judgment of the circuit judge is fully supported by the testimony, and under the rule which is now well settled this Court will not disturb the findings of fact by the Master concurred in by the Circuit Judge, in matters of equity jurisdiction, unless such conclusions are against the clear preponderance of the evidence or without any supporting evidence, and it is incumbent on the appellant to convince the Court that the Circuit Judge was in error in the conclusion reached by him on the facts. *Fant v. Easley*

*Loan & Trust Co.,* 170 S. C., 61, and cases cited on page 78, 169 S. E., 659, 665. * * * "·

As in the case just above cited, we are of the opinion ▉▉ that the record justifies the holding that Series 36 had matured; and that it is too late for stockholders in any subsequent series to question its maturity.

Upon the maturity of Stock Series 36, the stockholders in that series ceased to be stockholders and the relationship between them and the association became that of creditor and debtor; and they are entitled to a preference over stockholders. *Moore v. Southern Mutual B. & L. Association,* 50 S. C., 89, 27 S. E., 543; *Griffin et al. v. White,* 182 S. C., 219, 189 S. E., 127.

Under the facts of this case, we can see no valid reason why interest should not be paid on the balance of the indebtedness to members of Series 36, and until such deferred principal is paid. The interest under the contract between the association and the members of Series 36 is just as much a part of the indebtedness as the principal, and is controlled by the above priority. As was stated in the prevailing opinion in *Carroll v. Cash Mills,* 125 S. C., 332, 345, 118 S. E., 290, 294, "the appointment of a receiver works no metamorphosis in the title or interest to or in the assets of the insolvent; that the receiver takes possession of them as the arm of the Court, subject to all existing liens and incumbrances, to be administered under the direction of the court, having due regard to the legal and equitable rights of the parties and those stockholders and creditors represented by the Receiver."

The Master held that Series 37 did not mature, and ▉ this finding of fact was concurred in by the Circuit Judge. Such finding of fact is amply supported by the· record and this Court will therefore not disturb same.

The order appealed from is affirmed in part and reversed in part, as herein indicated.

Mr. Chief Justice Bonham, Messrs. Justices Fishburne and Stukes and Mr. Acting Associate Justice T. S. Sease concur.

## On Petition for Rehearing

*Per curiam.*

The opinion filed in this case, holding that the preferential status accorded Series 36 should not be disturbed as to payments already made, and should be given effect in the further distribution of the assets of the association, is vigorously challenged in a petition for a rehearing. In this petition it is asserted: "Today, the courts, without exceptions, hold that a stockholder whose stock has matured is not transformed into a creditor by virtue of the maturity of his stock."

The contention implies that the opinion filed holds to the contrary of this proposition. We think that this view is utterly untenable.

The petitioners concede that notwithstanding the general rule as to the status of a stockholder whose stock has matured, such stockholder does become a creditor of the association, with the incidental preferential rights of that status, as against the holders of unmatured shares in the association, where notice of withdrawal has been given the association.

That point was explicitly decided by this Court in the case of *Moore v. Southern Mutual Building & Loan Association,* 50 S. C., 89, 27 S. E., 543, 545. In that case, after quoting with approval an authority to the effect that a member of the association immediately becomes a creditor when notice of withdrawal has been given to and accepted by the association, the Court says: "The position taken by counsel for appellant that the plaintiffs still remain stockholders until their certificates were actually canceled is manifestly untenable. After the plaintiffs had done all that they were required to do to entitle them to claim the withdrawal value of their

stock, the association certainly could not be allowed to defeat such claim by delaying or refusing to formally cancel the certificates of stock."

Series No. 36 matured in 1932. Any issues of law and fact respecting that conclusion that may have been presented in the appeal in this case are settled by the opinion filed. The point is not contested in the petition for rehearing. At that time and for some years thereafter the solvency of the association was not seriously questioned. Its assets, however, were "frozen." They consisted principally of real estate and real estate mortgages. There were no funds with which to pay off the holders of Series 36. If a formal demand for payment or withdrawal had been made, it would have been a futile gesture. Recognizing this, the whole body of the membership of the association nevertheless immediately and continuously gave expression to the realities of the situation, and took precisely the measures which would have been taken if demand for payment had been made, and action had been instituted to enforce this demand. The first steps resulted in the procurement of a loan from the Reconstruction Finance Corporation on assets belonging to the entire association. Out of the proceeds of this loan, which was made for the sole and express purpose of providing funds to pay the holders of Series 36, 67 per cent. of the amount of the claims of that series were paid in 1932.

In subsequent proceedings of the association, without contest at any time prior to the institution of the present action, additional payments by way of preference were made to the holders of Series 36. In a further effort to settle with the holders of Series 36 on the same preferential basis, the association offered to exchange property and securities held by it for the claims of the holders of Series 36, and the proposal was that they receive credit at the rate of a hundred per cent. of the balance due them, including interest. In the case of the holders of shares in other series, no such exchange was offered.

In circulars distributed to the stockholders of the association from time to time setting forth the progress of the liquidation of the association the preference accorded to the holders of Series 36 was expressly set forth. For example, in the circular issued by the Executive Committee under date of April 15, 1935, it is explicitly stated that "no cash dividends will be paid to investing shareholders in subsequent series until investing shareholders in Series No. 36 have been settled with in full."

The view that the holders of Series 36, by reason of the extraordinary economic conditions under which their shares matured, should be given the status of shareholders who had made demand for payment of their claims was recognized by the association membership, by the representatives of the association who were in charge of the liquidation of the same, by the State Banking Department, and by the Receivers; and until the institution of the present action the assets of the association were consistently handled in that light. Predicating our holding that Series 36 is entitled to preferential payment on such a state of facts is far different from holding, as the petitioners imply we did, that a stockholder whose stock has matured becomes a creditor by virtue merely of the fact of the maturity of his stock.

While in one paragraph of the opinion it is stated that the maturity of Series 36 changed the status of the holders of stock in that series from stockholders to creditors, obviously this must be related to the facts and equities to which reference was previously made in the opinion.

It should be unnecessary to emphasize that the decision in this case rests upon and is limited to the facts before the Court. In that light there is no departure from any accepted principle of law, or any resulting injustice to the holders of the stock of the association in the series following Series 36.

The petition for rehearing alleges that certain errors were made in the statement of facts as contained in the opinion. None of the matters thus adverted to bear upon the disposi-

tion of the case or involve any conclusions on the part of the Court that will affect the administration of the receivership estate.

Let this order be published with the opinion heretofore filed.

The petition for rehearing is refused.

Mr. Chief Justice Bonham, Messrs. Justices Baker, Fishburne and Stukes and Mr. Acting Associate Justice Sease concur.